# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

James Provins, Employee/Deceased, Debra Provins, Alleged Dependent, Claimants, Appellants,

v.

Spirit Construction Services, Inc., Employer, and Insurance Company of the State of PA, Carrier, Respondents.

Appellate Case No. 2018-000133

---

Appeal From The Workers' Compensation Commission

---

Opinion No. 5790
Heard September 22, 2020 – Filed January 13, 2021

---

**AFFIRMED**

---

Donald Loren Smith, of Attorney Office of Donald Smith, of Anderson, for Appellants.

J. South Lewis, II, of Willson Jones Carter & Baxley, P.A., of Greenville, for Respondents.

---

**KONDUROS, J.:** Debra Provins, widow of James Provins, appeals the decision of the Appellate Panel of the South Carolina Workers' Compensation Commission (the Commission) denying her claim for death benefits and finding Provins's death was not causally related to the accident on the job. She also asserts the Appellate Panel erred in (1) failing to find Spirit Construction Services, Inc., employer, and Insurance Company of the State of PA, carrier, acted in bad faith in delaying medical authorization, which was also against public policy; (2) giving greater

weight to one medical opinion over others; and (3) failing to find permanent impairment.  We affirm.

**FACTS/PROCEDURAL HISTORY**

Spirit Construction Services hired James Provins (Employee), a life-long ironworker with thirty years' experience, to help construct a building in Anderson.  Approximately six months after starting this job, on January 24, 2012, Employee and a coworker were together moving a corrugated sheet of galvanized steel when Employee felt a pop in his right shoulder.  The safety foreman drove Employee to Spirit's clinic and a physician's assistant (PA) obtained an x-ray, diagnosed a shoulder sprain, prescribed medications and exercises, and put Employee's right arm in a sling.

One week later Employee returned to Spirit's PA.  The PA's notes indicate Employee continued to have pain and decreased mobility of his arm: "Patient states he has had no improvement of symptoms.  He states he is unable to lift arm above his head and wakes up in the middle of the night if he rolls over onto his shoulder."  The PA requested a magnetic resonance imaging scan (MRI): "Signs and symptoms suspicious for rotator cuff injury.  Will have patient scheduled for MRI of shoulder pending [workers' compensation] approval."   However, the employer and carrier (collectively, Employer) did not authorize the MRI.  Employee therefore independently obtained an MRI, which showed extensive tearing of the rotator cuff.  Employee was given several days of light duty work, until Spirit ended Employee's employment indicating no additional light duty work was available.  Employee returned to his permanent home in Louisville, Kentucky.

Despite Spirit's PA's examination and recommendation to obtain an MRI and despite the results of the independent MRI showing an extensive tear, Employer denied approval for medical treatment and benefits.  Employee then moved for a hearing before the Commission to seek benefits and treatment.

On September 7, 2012, the single commissioner, noting Employee was "very credible," found the accident was within the scope of Employee's employment and required Employer to provide benefits and medical treatment to him in his home state of Kentucky.  Employee began treatment with an orthopedist, Frank Bonnarens, M.D., the authorized medical provider in Kentucky where Employee resided.  Dr. Bonnarens performed rotator cuff surgery on May 15, 2013.  The surgical notes state Employee had "a massive tear of the rotator cuff" and a tear "of the long head of the biceps."  Following surgery, Dr. Bonnarens ordered physical

therapy. Employee faithfully followed those orders from June 7, 2013, through August 23, 2013. The physical therapy notes repeatedly reference Employee's continued pain and limitations.

Employee returned to Dr. Bonnarens on August 26, 2013, and reported "he fe[lt] like he is not getting any better" and "his active range of motion is poor at this point." Dr. Bonnarens then ordered additional weeks of therapy, followed by an MRI performed on October 2, 2013. This second MRI revealed "a large recurrent full thickness tear" and atrophy.

Both parties indicated Dr. Bonnarens recommended a second surgery; however, after a telephone conference with Dr. Bonnarens on December 30, 2013, the Employer chose to pursue an investigation to determine the cause of the re-tear. Employee filed a motion on March 14, 2014, to compel Employer to provide treatment, seeking coverage for the second surgery. In the motion, Employee stated:

> Due to the high risk of failure of rotator cuff surgeries, [Employee] re-tore his rotator cuff without intentional cause. Dr. Frank Bonnarens stated that this injury is directly related to the injury [Employee] sustained while under the scope of his employment on January 24, 2012[,] during a phone conference on December 30, 2013. As such, [Employer is] held responsible for providing [Employee] with necessary treatment.

In response to Employee's motion, Employer described the opinion of Dr. Bonnarens differently, asserting Dr. Bonnarens reported Employee had decreased his alcohol use and suffered from alcohol withdrawal symptoms. Employer argued Dr. Bonnarens indicated it was possible Employee's alcohol withdrawal symptoms caused the re-tear, but without any evidence of a subsequent injury, it was his opinion the re-tear was related to the 2012 work injury. Based on this telephone conference with Dr. Bonnarens, Employer asked Employee to sign authorization forms so it could obtain medical records from his providers in Kentucky to investigate the re-tear further. Employee did not sign the medical authorization forms. Employer moved to compel Employee to sign the forms.

On April 10, 2014, while the above motions were pending, Employee asked a friend to drive him to the emergency room of a hospital, complaining of chest pain. Employee was intubated and transferred to another hospital where he was admitted

to the intensive care unit. Employee died four days later on August 14, 2014. The death certificate indicated the immediate cause of death was the result of "acute respirator[y] failure" and "septic shock," and that "significant conditions contributing to death" were "pneumonia, acute renal failure, [and] alcohol abuse."

After Employee's death, orthopedist Dr. Dwight A. Jacobus, who had not treated Employee, opined Employee had a 10% to 13% disability to his shoulder. In follow up correspondence, Dr. Jacobus further opined:

> [W]hether the patient was not deceased and was able to have a second surgery, he would still have a disability percentage of at least 10% to 13% . . . . It is my opinion that a second surgery would not relate to a diminished percentage of disability because of the pathology that was present at the time the first surgery was completed.

Debra Provins (Widow) filed a Form 52 claim for death benefits asserting Employee's death was causally related to the work injury because the bad faith denial of medical care by Employer caused Employee's increased use of alcohol, which contributed to his death.[1] The use of alcohol by Employee was chronicled throughout the workers' compensation proceedings. The Record reveals that Employee drank alcohol, often in excess, for much of his life. A single commissioner heard Widow's claim for death benefits on December 5, 2016, in which Widow testified about her husband's decline as he suffered the effects of the injury and the re-tear of his shoulder, his inability to support his family, and his change in demeanor. Widow testified Employee increased his alcohol consumption after the 2012 accident and became withdrawn from his family, spending time in his bedroom alone. In support of her claim for death benefits, Widow submitted the opinion of a psychologist, David R. Price, Ph.D., and an affidavit from a psychiatrist, Thomas V. Martin, M.D., both of whom indicated Employee's death was causally related to the work injury, as well as the opinion of Dr. Jacobus regarding the permanency rating. Employer submitted the opinion of psychiatrist James C. Ballenger, M.D., who opined Employee's death was not caused by the work injury, but caused by Employee's alcohol use.

In an order filed on March 6, 2017, the single commissioner concluded Widow did not prove Employee's death was causally related to the work injury. The

---

[1] Widow originally filed claims pursuant to Form 50, but withdrew those forms, and ultimately filed a claim for death benefits pursuant to Form 52.

commissioner noted: "[t]here was no objective evidence—only subjective history provided by Employee's relatives—that his drinking increased significantly after his work injury."  The commissioner found "[e]ven assuming Employee had increased his alcohol intake after—and because of—the work injury, such would not constitute a compensable work 'injury by accident' or death."  The single commissioner also noted the evidence showed Employee abused alcohol before the work accident; Employee died before he reached maximum medical improvement [MMI] and was still being treated by Dr. Bonnarens at the time of his death; and "[t]here was no bad faith denial of medical treatment or unreasonable delay by [Employer]."

Widow appealed to the Appellate Panel.  After a hearing on November 14, 2017, the Appellate Panel agreed with the single commissioner and found Employee died before reaching MMI; "[t]here was no bad faith denial of medical treatment or unreasonable delay by [Employer]"; and prior to the work-related injury, Employee "suffered from a significant alcohol abuse problem."  The Appellate Panel expressly found none of the medical reports submitted stated Employee's alcohol use changed after the accident, and Employee's death was "multifactorial, to include sepsis, respiratory failure, multi-organ decompensation, and alcohol abuse."  The Appellate Panel concluded Employee's death was not caused by the injury he sustained at work in 2012.  This appeal followed.

**STANDARD OF REVIEW**

> The Administrative Procedures Act ("APA") governs this [c]ourt's review of the [Appellate Panel's] decisions.  We can reverse or modify the [Appellate Panel's] decision in this case only if [the claimant's] substantial rights have been prejudiced because the decision is affected by an error of law or is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.  Substantial evidence is not a mere scintilla of evidence nor evidence viewed from one side, but such evidence, when the whole record is considered, as would allow reasonable minds to reach the conclusion the [Appellate Panel] reached.

*Shealy v. Aiken County*, 341 S.C. 448, 454-55, 535 S.E.2d 438, 442 (2000) (citations omitted).

"[T]he [Appellate Panel] is the ultimate fact finder.  The final determination of witness credibility and the weight to be accorded evidence is reserved to the [Appellate Panel].  It is not the task of this [c]ourt to weigh the evidence as found by the [Appellate Panel]."  *Id.* at 455, 535 S.E.2d at 442 (citations omitted).

**LAW/ANALYSIS**

**I.      Death Benefits**

Widow asserts the Appellate Panel erred in denying her claim for death benefits, contending Employee's death "was a consequence of [Employer's] delay in [the] provision of medical assistance and grant of benefits to [Employee]."   Widow contends the accident and "[Employer's] continued refusal to provide the necessary and timely medical assistance[] triggered and/or aggravated [Employee's] state of decline."  Widow contends "[h]e lost hope of ever recovering" and "[a]nyone in his condition would have suffered extreme depression, documented or not."  We disagree.

Employer contends no evidence was presented to the Appellate Panel of Employee's depression from the injury and there was no diagnosis of depression from the treating physician as a result of the work-related accident.  Employer also argues Employee abused alcohol throughout his life, including before the accident.  Finally, Employer asserts Employee's use of alcohol was an intentional act on his part, and not caused by Employer.  The Employer's expert, Dr. Ballenger, opined Employee's death was not causally related to the work injury and the evidence revealed Employee died as a result of his lifelong consumption of alcohol.

The Appellate Panel reviewed the evidence and found that prior to the work injury, Employee abused alcohol for most of his life, he undertook the risk of heavy alcohol use, and no medical evidence indicated Employee's use of alcohol increased after the accident.  This evidence included the consultation report when Employee went to the emergency room four days before his death, which stated: "[t]he patient is a 52-year-old male who is an alcoholic and drinks about half a pint of vodka every day for most of his life" and medical records from 2009, when Employee was hospitalized during a difficult time in his life, which stated: "[h]eavy alcohol use. . . .  Patient is a longstanding alcoholic (16 to 18 beers a day, ½ [pint] to 1 pint[)]."  Furthermore, the Appellate Panel referenced Dr. Ballenger's opinion, noting Employee "suffered from a progressively worsening alcoholism over the course of his adult life," and such was "consistent with the medical records, both prior to and subsequent to the work injury."  The Appellate Panel

also stated: "[T]here is not a single medical record, either with the treating workers' compensation doctors or his personal doctor/hospitals in Kentucky, which indicate that Employee's alcohol consumption increased after the work injury."

We believe the Record contains substantial evidence to support the Appellate Panel's denial of Widow's claim for death benefits. *See Shealy*, 341 S.C. at 455, 535 S.E.2d at 442 (citations omitted) ("In workers' compensation cases, the [Appellate Panel] is the ultimate fact finder. The final determination of witness credibility and the weight to be accorded evidence is reserved to the [Appellate Panel]. It is not the task of this [c]ourt to weigh the evidence as found by the [Appellate Panel]."). Accordingly, we affirm the Appellate Panel's denial of the claim for death benefits.

## II.    Weight of Medical Evidence

Widow also contends the Appellate Panel erred in giving more weight to one physician's opinion over the opinion of other medical experts. We disagree.

"Expert medical testimony is designed to aid the Commission in coming to the correct conclusion; therefore, the Commission determines the weight and credit to be given to the expert testimony." *Tiller v. Nat'l Health Care Ctr. of Sumter*, 334 S.C. 333, 340, 513 S.E.2d 843, 846 (1999). In addition, "the Commission is given discretion to weigh and consider all the evidence, both lay and expert, when deciding whether causation has been established." *Id.* at 339-40, 513 S.E.2d at 846.

"Where there is conflicting medical evidence . . . the findings of fact of the [C]ommission are conclusive." *Nettles v. Spartanburg Sch. Dist. # 7*, 341 S.C. 580, 592, 535 S.E.2d 146, 152 (Ct. App. 2000). "The existence of any conflicting opinions between the doctors is a matter left to the Commission." *Harbin v. Owens-Corning Fiberglas*, 316 S.C. 423, 427, 450 S.E.2d 112, 114 (Ct. App. 1994). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the Commission's] finding from being supported by substantial evidence." *Tiller*, 334 S.C. at 338, 513 S.E.2d at 845.

We find the Appellate Panel relied on substantial evidence to support its decision to give greater weight to the opinion of Employer's expert, psychiatrist Dr. Ballenger. The decision of the Appellate Panel referenced Dr. Ballenger's extensive credentials and lengthy career, as well as his more complete review of the medical records. The Appellate Panel also set forth its reasoning for giving

less weight to other medical experts, finding Dr. Martin's affidavit unreliable because it relied on "subjective history" and noting he did not review medical records of Employee's alcohol use prior to the work injury. The Appellate Panel found Dr. Price, a clinical psychologist, unqualified to provide a medical opinion regarding a cause of death and that his opinion was also based upon limited information.

The law expressly gives to the Appellate Panel the full authority to make determinations regarding the credibility of witnesses and the weight to be afforded their opinions. Accordingly, we find no error in the Appellate Panel's decision.

### III.    Permanent Impairment Rating

Widow contends the Appellate Panel erred in failing to award Employee a permanency rating. We disagree.

The single commissioner found Employee "passed away . . . before he reached [MMI] for his right shoulder," and "had not been released from care for his right shoulder, and was still undergoing treatment with Dr. Bonnarens" at the time of his death. The single commissioner made no finding regarding a permanency rating. Widow submitted a memorandum to the Appellate Panel, which included raising the issue whether the single commissioner erred in finding Employee did not have a permanent injury. However, the Appellate Panel found Employee was still receiving treatment and had not been released from care or reached MMI at the time of his death. The Appellate Panel did not make a specific finding regarding a permanency rating.

We note that while Dr. Jacobus's opinion was included in the submission of exhibits to the Commission, Widow did not raise the issue of a permanency rating to the Commission at the hearing. Widow was only before the Commission on a Form 52 seeking death benefits; she had previously withdrawn her Form 50 notices. Accordingly, we find no error by the Appellate Panel.

### IV.    Bad Faith and Public Policy

Widow asserts the Appellate Panel erred in failing to find Employer acted in bad faith by delaying authorization for medical treatment. Widow contends Employer acted in bad faith by refusing to authorize the initial MRI and need for surgery, asserting this delay caused Employee "irreparable damage" to his shoulder. Widow also contends Employer acted in bad faith by denying authorization for the

proposed second surgery to repair the re-tear. Additionally, Widow asserts the Appellate Panel "contradicted public policy by fostering and facilitating bad faith denial of benefits."

Treatment for the first surgery was addressed by the single commissioner's order of September 7, 2012, providing Employee medical treatment in Louisville, Kentucky, and awarding Employee temporary total disability until he reached MMI.[2]

When Widow later filed a Form 52 seeking death benefits, both the decisions of the single commissioner on March 6, 2017, and of the Appellate Panel on January 11, 2018, included findings of fact that there was no bad faith denial by the Employer and that Employer had requested medical releases to investigate the need for the second surgery. More specifically, in its order of January 11, 2018, the Appellate Panel found: "There was no bad faith denial of medical treatment or unreasonable delay by [Employer]. The evidence . . . indicate[s] that another surgery had been recommended by Dr. Bonnarens (for a recurrent rotator cuff tear) and [Employer] requested medical releases be signed to further investigate causation of same."

In response to Widow's bad faith argument, Employer contends an allegation of bad faith is "simply unfounded" and "there is no recognizable claim for bad faith within the South Carolina workers' compensation arena." Employer also argues the evidence supported the need for medical authorization documents from Employee because the Record contained no definite medical opinion that related the re-tear of the rotator cuff to the work injury.

We note that at the time of Employee's death, the parties had outstanding motions regarding Employee's request for authorization for the second surgery and Employer's request Employee sign medical authorizations. Sadly, Employee passed away before the Commission could rule on these motions.

In finding Employer did not deny medical treatment in bad faith or unreasonably delay authorizing treatment, the Appellate Panel made the following finding of fact: "[t]he evidence, including emails among counsel included in [Employer's] exhibits, indicate that another surgery had been recommended by Dr. Bonnarens

---

[2] The single commissioner's ruling dated September 7, 2012, in which Employee sought benefits and medical treatment is not the subject of this appeal.

(for a recurrent rotator cuff tear) and [Employer] requested medical releases be signed to further investigate causation of same."

We affirm the decision of the Appellate Panel finding there was no bad faith denial of medical care by Employer.  We point to our jurisprudence which established the statutory system of workers' compensation law to address all claims made by an employee against his employer for a work-related injury.  As set forth in the Workers' Compensation Act:

> The rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.

S.C. Code Ann. § 42-1-540 (2015).

This court addressed the claim of an employee seeking damages in circuit court for his employer's bad faith denial of benefits in *Cook v. Mack's Transfer & Storage*, 291 S.C. 84, 352 S.E.2d 296 (Ct. App. 1986).  In *Cook*, this court determined all disputes in a workers' compensation matter must be directed to the Commission by statute: "[I]f an employer and injured employee fail to reach an agreement in regard to compensation within fourteen days after the employer has knowledge of the injury, then the worker may make application to the Commission for a hearing in regard to the matters at issue and for ruling thereon."  *Id*. at 87-88, 352 S.E.2d at 298.

The court went on to confirm the Commission has exclusive jurisdiction to decide questions an employee may raise about his employer's denial of benefits, and "[w]hether the denial is willful, in bad faith, negligent, or the result of a good faith difference is immaterial to the question of the Commission's exclusive jurisdiction."  *Id.* at 88, 352 S.E.2d at 299.  In *Cook*, this court recognized the exclusive jurisdiction of the Commission means an employee does not have the same causes of action available to him as he would in common law:  "a worker whose injury is compensable exclusively under the workers' compensation law

may be at a disadvantage compared to a person with access to modern tort remedies." *Id.* at 92, 352 S.E.2d at 301.

As the Form 50 notices were withdrawn, and substantial evidence supports the decision of the Appellate Panel to deny death benefits, we need not rule on the question of any bad faith failure of Employer to authorize treatment.

## CONCLUSION

We conclude the Record contains substantial evidence to support the Appellate Panel's decision. Accordingly, the Appellate Panel's decision is

**AFFIRMED.**

**LOCKEMY, C.J., and MCDONALD, J., concur.**